# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**WALEED ALBAKRI,**

      **Plaintiff,**

**v.**                                                              **Case No:   6:15-cv-1969-Orl-31GJK**

**SHERIFF OF ORANGE COUNTY,**

      **Defendant.**

## ORDER

This matter is before the Court, without a hearing, on the Motion for Summary Judgement (Doc. 20) filed by the Defendant, Orange County Sheriff Jerry L. Demings in his official capacity; the Amended Response in Opposition (Doc. 27) filed by the Plaintiff Waleed Albakri; and Defendant's Reply thereto (Doc. 28).

**I.  Background**

Albakri is a Sunni Muslim who holds dual citizenship in Jordan and the United States. Albakri began working for Defendant as a deputy sheriff in March 2008, and worked as a patrol officer until October 2010, when he transferred to Defendant's narcotics unit. At the time, the narcotics unit was comprised of approximately twenty-five to thirty deputies divided into three squads. Albakri was assigned to "Squad 3" for the duration of his time in the narcotics unit, and it was this assignment that marked the beginning of the alleged harassment he endured.

### A.   The Alleged Harassment

Upon joining the narcotics unit, Albakri began training with Officer Michael Mandarano.[1] (Doc. 20-1 at 17.) During training, Mandarano would announce to the squad that he could barely understand Albakri and made statements such as "I don't understand you. Speak English," or that Albakri "shouldn't even be a cop." (*Id.*) Mandarano would also ask if Albakri was going to go pray when he would leave the room. Albakri told Mandarano to "knock it off" and to leave him alone, but he never reported the treatment to his supervisors citing fear of retaliation and becoming an outsider. (*Id.* at 17–18.) Eventually, after it became apparent that Mandarano was not treating him fairly in training evaluations, Albakri requested a new training officer and was moved. No further alleged harassment occurred throughout the remainder of training, though, this respite was short-lived. (*Id.* at 18.)

A month and a half after training concluded, tension began to rise between Albakri and Sergeant Batie, Squad 3's supervising officer. Albakri and other officers reported Batie to the acting lieutenant questioning his law enforcement tactics and recounting Batie's failure to answer phone calls. (*Id.* at 18–19.) These reports led to Batie's reprimand at a squad meeting. After the meeting, Batie singled out Albakri calling him a rat. (*Id.* at 19.) A few months later, the animosity escalated when the squad started performing prostitution stings.

Apparently, prostitution stings are rather difficult to perform, but Albakri was adept. (Doc. 20-1 at 19.) Albakri would "pick up" four or five prostitutes, both male and female, in the course of an hour. (*Id.*) During these operations, Albakri would often make statements related to his

---

[1] Both parties refer to Albakri's training officer as Officer Mandarano in their papers and cite the same portion of Albakri's deposition. But Albakri refers to his training officer as Officer Maldonado in the portion of his deposition cited by the parties. (Doc 20 at 3; Doc 27 at 3; Doc 20-1 at 17.) Presumably, these officers are the same person.

sexual activity in an attempt to show the target that he was a homosexual. Recognizing Albakri's skill, Batie began harassing him with statements like, "Man, you're killing it. You are a faggot because you know how to pick up those dudes and those girls." (*Id.*) Albakri asked Batie to "knock it off" and that homosexuality was "not taken lightly in [his] faith," but from that point on Batie would often refer to Albakri as "faggot, gay, [or] fag." (Doc. 20-1 at 19; Doc. 24-1 ¶ 12.)

This harassment would often occur in front of the rest of Squad 3 and sometimes in public. (Doc. 24-2 at 45.) In one instance, when Albakri, Batie, and another officer were at a restaurant, Batie and the other officer told their waitress that Albakri "was a fag," and, after Albakri objected, Batie continued saying, "no . . . he is gay . . . he likes guys . . . [and] he's a fag." (Doc. 24-2 at 6.) After the waitress left the table, Albakri told Batie that he was not gay and asked why Batie called him such derogatory terms in front of the waitress. Batie replied "stop crying about it." (*Id.*) In another instance, at a human trafficking conference, Batie called Albakri a "fag and a loser" in front of other law enforcement professionals. (*Id.* at 5.) Albakri objected to the name-calling and Batie responded, "Shut up fag . . . you're nothing but a whining cry baby." (*Id.*)

In addition to the homosexual-related comments, Albakri also suffered harassing comments related to his wife and sister-in-law. In October 2011, Batie and another officer went to Albakri's home to check on him after surgery. (Doc. 20-9 at 5–6.) After meeting Albakri's wife and sister-in-law he mentioned that they "were beautiful" and asked if Albakri's sister-in-law was dating anyone. Albakri responded, "No, she's not dating anybody . . . she's still young, you know, we're Arabs. We don't just date, we get married. She's a virgin." (Doc. 20-10 at 20–21.)

From that point on, Batie made comments, often in front of other squad members, suggesting that he wanted to have sex with Albakri's sister-in-law by giving her his "big snake." (*Id.* at 21.) Batie would also tell Albakri that he just left Albakri's wife and suggest that Albakri

should ask "for the condom [he] left next to [Albakri's] bed" or "about [Batie's] snake." (*Id.*) At one point, when other squad members were laughing at Batie's antics, Albakri warned, "you guys think it's funny but it's not. You guys don't know, that we are very strict people. We don't just talk about these things." (*Id.* at 22.)

In addition to the homosexual slurs and sexual comments about his wife and sister-in-law, some comments directly related to Albakri's race or religion. (Doc. 24-2 at 27.) Besides the comments made by Mandarano discussed above, Albakri was called "terrorist," "seven eleven," "Haji," and was called "sand nigger" at least once. (Doc. 20-1 at 55.) He was told he "would never be an American;" that "people like" Albakri could go right through security at an airport, whereas "an American" would be searched; and that Albakri's baby was likely on the "no-fly list." (*Id.*; Doc 24-4 at 7.) And one final example, on Ramadan, Batie asked Albakri why he was isolating himself. Albakri responded that "in [his] religion, from sunrise to sunset, we cannot eat, drink or participate in anything," to which Batie responded, "You cannot fast on my watch" and ordered Albakri to give his assigned vehicle away. (Doc. 20-1 at 30.)

Much of this harassment occurred throughout Albakri's time with Squad three. (Doc. 24-1 ¶ 13.) Albakri states that he was offended and degraded by the comments and that he would sometimes cry on his way home from work. (Doc. 20-1 at 52, 59.) On one occasion, he was so distraught that his wife felt the need to call a close friend to their home to comfort him. (*Id.* at 61.) There is also evidence that Albakri sought mental-health counseling and was prescribed an antidepressant. (*Id.* at 52.)

While much of the harassment targeted Albakri, there is also evidence that Albakri made similar, offensive comments to his colleagues. For example, Albakri once said to Batie "a fag would know a fag, if you think I'm a fag, so you have to be a fag because you always say I have

fag radar so you must have that same radar." (Doc. 20-8 at 36.) Albakri also changed the screensaver on another officer's computer to a "gay flag." (*Id.* at 28–29.) Additionally, Albakri would joke about his ethnicity and religion: he tolerated, if not accepted, the nickname "Kaboom" and walked around the office clicking a pen like a bomb detonator (Doc. 20-1 at 40), and he often ululated, mimicking an Arabic war-cry (Doc. 20-5 at 14).[2] Albakri has also made inappropriate racial comments about his colleagues, once referring to an African American colleague's children as "little monkeys."[3] (Doc. 20-7 at 3–4.)

### B. Reporting the Harassment

Eventually, Batie recognized that Albakri was being bullied by other members of the squad and brought it to the attention to his superior, Captain Mark Pillington, in February or March of 2012. (Doc. 24-4 at 17.) Captain Pillington's response was that if Albakri processed more cases, the squad would leave him alone. (*Id.*) In August of 2012, Albakri verbally reported the harassment to Lieutenant Bruce McMullen, his division commander at the time. (Doc. 20-1 at 30.) During the meeting, Albakri broke down crying. (*Id.*) Lieutenant McMullen advised that Albakri take his complaint to Defendant's Office of Professional Standards, and Albakri filed his official complaint with that office on August 24, 2012. (Doc. 20-2 at 8.) Two of the individuals identified in his complaint were Batie and Deputy Cristian Readdy. (*Id.*)

Within a week of the complaint, Defendant moved Batie from Squad 3 to work in evidence and moved Readdy, to records. (Doc. 20-1 at 31.) The investigation into Batie concluded on February 8, 2013, finding that there was no unlawful discrimination, but the complaint was

---

[2] Although, the record shows that Albakri objected to names like "haji" and "seven eleven." (Doc 20-1 at 39.)

[3] Albakri explains that by "little monkeys" he was only referring to the children's activity level and did not mean it as a racial comment. (Doc. 20-1 at 39; Doc. 24-1 ¶ 18.)

- 5 -

sustained for failing to maintain a competent level of supervision over his squad by actively participating and encouraging inappropriate conduct. (Doc. 24-2 at 48.) Batie was initially suspended and demoted, but the demotion was reversed on administrative appeal. (Doc. 20-17 at 8–9.)

The investigation into Readdy concluded on March 5, 2013, and the complaint was not sustained for any policy violation. (Doc. 20-2 at 120.) Specifically, the investigation found that on one occasion Readdy made a comment about checking Albakri for bombs, but the comment was isolated. The report concluded that Albakri participated in much of the same inappropriate conduct that he complained of and that there was no unlawful discrimination. (*Id.*)

On July 5, 2013, Albakri filed a charge of discrimination with the United States Equal Employment Opportunity Commission (EEOC), alleging discrimination based on the above-described conduct. (Doc. 20-21 at 5.) On September 11, 2015, the United States Department of Justice issued notice of Albakri's right to sue on his EEOC claim (Doc. 9 ¶ 74; Doc. 11 ¶ 74), and Defendant received notice of the charges around September 17, 2013. (Doc. 20-21 at 1.)

### C.  **Insurance Fraud Charges, Arrest, and Termination**

Meanwhile, in May 2012, the Florida Division of Insurance Fraud (FDIF) filed a probable cause affidavit after investigating an insurance claim filed by Albakri in September 2011. (Doc. 29-1 at 86.) Allegedly, Albakri submitted fraudulent information and evidence related to a claim for a stolen computer. (Doc. 20-1 at 106.) Defendant had no knowledge of the investigation until the State of Florida issued a warrant for Albakri's arrest on October 25, 2012. Defendant received the warrant and executed it, arresting Albakri on October 26, 2012—roughly two months after Albakri filed his initial discrimination complaint.

The day after his arrest, Albakri was suspended without pay pending the conclusion of the criminal investigation against him. This suspension is standard practice. (Doc. 20-1 at 26–27.) Additionally, Defendant opened its own administrative investigation into any misconduct Albakri could have committed related to the insurance fraud charges, but it was tolled pending the outcome of the of the State's investigation. Seven months later, in May 2013, the State of Florida dropped its charges, and Albakri was reinstated to a position on the Narcotics unit. (*Id.* at 101.) Soon after, Defendant began its administrative investigation anew, and Albakri was transferred to non-enforcement duties pending its outcome.

On December 23, 2013, Defendant's investigative report was issued finding that Albakri submitted a fraudulent insurance receipt and finding that Albakri violated Defendant's policies. The specific provision, called "Conformance to Laws," provides that "Personnel will comply with the laws, ordinances, rules and Constitution of the United States, the State of Florida, or any of their subdivisions." (*Id.* at 123.) Albakri was issued a Notice of Intent to Discipline on December 30, 2013, which advised him that Defendant intended to terminate his employment. (Doc. 20-3 at 23.)

Albakri requested an administrative appeal, but, while his request was pending, the State of Florida refiled its criminal charges against him. After he was arrested for the second time, Albakri elected for pre-trial diversion and the State ceased prosecution. (Doc. 20-2 at 1–5.) Albakri's administrative appeal hearing was held on March 21, 2014. After reviewing the investigative report and hearing Albakri's testimony, the presiding officer found that Albakri's appeal was without merit. (Doc 20-3 at 25.) The next two levels of appeal ended with the same result. (*Id.* at 28–36.) Albakri was terminated effective April 1, 2014. (*Id.* at 36.)

### D. Summary of the Claims

Albakri brings four counts in his Amended Complaint (Doc. 9). In Counts I and III Albakri claims that Defendant subjected him to a hostile work environment in violation of 42 U.S.C. § 1981 and Title VII, 42 U.S.C. §§ 2000-1 to 2000-17. In Counts II and IV, Albakri claims that Defendant retaliated against him for reporting the discriminatory harassment he suffered and that his termination was the result of disparate treatment in violation of the above-cited provisions.

## II. Summary Judgment

A party is entitled to summary judgment when it can show that there is no genuine issue as to any material fact. Fed. R. Civ. P. 56(c); *Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 458 (11th Cir. 1994). Which facts are material depends on the substantive law applicable to the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The moving party bears the burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991); *Watson v. Adecco Employment Servs., Inc.*, 252 F. Supp. 2d 1347, 1351–52 (M.D. Fla. 2003). In determining whether the moving party has satisfied its burden, the court considers all inferences drawn from the underlying facts in a light most favorable to the party opposing the motion, and resolves all reasonable doubts against the moving party. *Anderson*, 477 U.S. at 255.

When a party moving for summary judgment points out an absence of evidence on a dispositive issue for which the non-moving party bears the burden of proof at trial, the non-moving party must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex Corp.*, 477 U.S. at 324–25 (internal quotations and citations omitted). Thereafter, summary judgment is mandated against the non-moving party who fails to

make a showing sufficient to establish a genuine issue of fact for trial. *Id.* at 322, 324–25; *Watson*, 252 F. Supp. 2d at 1352. The party opposing a motion for summary judgment must rely on more than conclusory statements or allegations unsupported by facts. *Evers v. Gen. Motors Corp.*, 770 F.2d 984, 986 (11th Cir. 1985) ("conclusory allegations without specific supporting facts have no probative value") (citations omitted); *Broadway v. City of Montgomery, Ala.*, 530 F.2d 657, 660 (5th Cir. 1976).

### III. Hostile Work Environment Claims

Albakri brings hostile work environment claims in two counts: Count I under 42 U.S.C. § 1981; and Count III under Title VII, 42 U.S.C. §§ 2000-1 to 2000-17.[4] To succeed in a hostile work environment claim a plaintiff must show harassing behavior "sufficiently severe or pervasive to alter the conditions of [his or her] employment." *Pa. State Police v. Suders*, 542 U.S. 129, 133 (2004). This requires that the plaintiff prove:

> (1) that he belongs to a protected group; (2) that he has been subject to unwelcome harassment; (3) that the harassment must have been based on a protected characteristic of the employee, such as national origin; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability.

---

[4] Originally, the language in § 1981 "to make and enforce contracts" was interpreted as inapplicable to "conduct that occurred after the formation of the contract." *Jones v. R.R. Donnelley & Sons Co.*, 541 U.S. 369, 373 (2004). Thus, hostile work environment, wrongful discharge, and refusal to transfer claims were not cognizable under that section. *Id.* But, in 1991, Congress expanded the language of § 1981 to include "the termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship," thus enlarging the "category of conduct that is subject to § 1981 liability," and now including the above claims. *Id.* at 383.

- 9 -

*Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir. 2002).[5] Defendant does not dispute that Albakri is a member of a protected class, therefore, the Court begins its analysis at the second element.

### A. Was the Conduct Unwelcome?

Harassing conduct is "unwelcome" so long as the employee "regarded the conduct as undesirable or offensive" and neither solicited nor incited it. *Henson v. City of Dundee*, 682 F.2d 897, 903 (11th Cir. 1982) (citations omitted). Defendant claims that Albakri "solicited and incited" all of the harassing conduct he complains of, therefore, he cannot show it was unwelcome. *Weinsheimer v. Rockwell Int'l Corp.*, 754 F. Supp. 1559, 1564 (M.D. Fla. 1990). For support, Defendant relies on evidence that Albakri called himself "kaboom" and walked around the office clicking his pen like a bomb detonator; that he ululated when entering the room to announce his presence; that he called other officers homosexual slurs; and that he made racists comments to and about other officers.

Albakri admits that he participated in much of the offensive conduct, but he argues that it was only in an effort to fit in with the "toxic culture" of the squad. Indeed, other deputies have described Squad 3's environment as inundated with "inappropriate comments and gestures" (Doc. 24-4 at 25–26) and "trash talking" (Doc. 20-2 at 27). Batie himself believed Albakri's conduct was an attempt to fit into the squad culture. (Doc. 20-3 at 86.) Additionally, much of the conduct that Defendant cites as Albakri's participation were comments that he made in the course of

---

[5] Hostile work environment claims brought under 42 U.S.C. § 1981 and Title VII "are subject to the same standards of proof and employ the same analytical framework." *Bryant v. Jones*, 575 F.3d 1281, 1296 n. 20 (11th Cir. 2009).

prostitution stings. (Doc. 20 at 4.) Such statements made in an attempt to "pick up" prostitutes as part of his duties do not show that he welcomed the harassment that followed.

Finally, there is evidence in the record that Albakri voiced objections to much of the complained-of conduct as early as mid-2011, and continued objecting until his suspension in October 2012. (Doc. 20-1 at 37, 59; Doc. 20-2 at 72; Doc. 20-10 at 22; Doc. 24-1 ¶ 12.) There is also evidence that even Batie reported that Albakri was being harassed by the squad. (Doc. 24-2 at 11.) Taking the above, along with the evidence that Albakri may have only participated in the conduct to fit in, there is a genuine issue as to whether the harassment was unwelcome. *Weinsheimer*, 754 F. Supp. at 1564 (stating that even if a plaintiff participated in the complained of conduct, a plaintiff "simply must show that at some point she clearly made her coworkers and superiors aware that in the future such conduct would be considered 'unwelcome'").

### B. Was the Harassment Based on a Protected Characteristic?

Analysis of next element—that the harassment was based on a protected characteristic of the employee—requires a similar conclusion. Albakri objected to the homosexual slurs and sexual comments related to his wife and sister-in-law and specifically explained that these comments offended his religious and cultural beliefs. (Doc. 20-10 at 19, 21; Doc. 24-1 ¶ 12.) Yet the harassment continued. Taking these objections combined with the harassment directly targeting his ethnicity and religious beliefs leads to an inference that all of the harassment targeted Albakri's protected characteristics. Thus, there are facts that could lead a reasonable jury to conclude that the harassment was related to Albakri's religious and cultural beliefs.

### C. Was the Conduct Sufficiently Severe or Pervasive?

As to the severity or pervasiveness of the discriminatory conduct, courts consider its "frequency . . . ; severity; whether it [was] physically threatening or humiliating, or a mere

offensive utterance; and whether it unreasonably interfere[d] with an employee's work performance." *Reeves v. C.H. Robinson Worldwide, Inc.*, 594 F.3d 798, 808 (11th Cir. 2010) (*en banc*) (citation omitted). Additionally, a plaintiff must show that the environment was "both subjectively and objectively hostile." *Id.*

The record suggests that the above factors are genuinely in dispute. There is evidence that officers called Albakri homosexual slurs daily, and that the sexual comments about his wife and sister-in-law occurred often. (Doc. 20-1 at 38.) There is evidence that the harassment was both objectively and subjectively severe. Albakri would sometimes cry on his way home from work and was prescribed an antidepressant as a result; and other officers, including Batie, agreed that at least some of the conduct was severe. (Doc. 24-2 at 8, 27.) Further, there is evidence that the harassment was humiliating. Batie called Albakri homosexual slurs in public and in front of his peers. (*Id.* at 5–6, 45.)

Drawing all inferences in a light most favorable to Albakri, these facts suggest that there remains a genuine issue as to whether the conduct was sufficiently severe or pervasive. *Anderson*, 477 U.S. at 255.

### D.     Is Defendant Responsible for the Harassment?

An employer's liability in a hostile work environment claim depends on the status of the harasser. *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013). "If the harassing employee is the victim's co-worker, the employer is liable only if it was negligent in controlling working conditions." *Id.* But if the harasser is a supervisor, the analysis depends on whether there was a tangible employment action taken against the plaintiff. If the harasser is a supervisor and the "harassment culminates in a tangible employment action, the employer is strictly liable." *Id.* However, if the harasser is a supervisor and "no tangible employment action is taken" then an

employer may raise the defense "that (1) [it] exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventative or corrective opportunities that the employer provided." *Id.*

Here, Batie was Albakri's supervising officer and Albakri has not alleged that Batie himself took any tangible employment action. Thus, Defendant has raised the available "reasonable care" defense. Specifically, Defendant argues that it took "immediate and appropriate action after learning of [Albakri's] allegations," and that Albakri "failed to report much of the conduct that occurred over the first two years of his assignment" to Squad 3. (Doc. 20 at 18–19.) Albakri responds citing evidence that, in compliance with Defendant's policies, he reported the harassment to his superiors. In October 2011, Albakri complained of the harassment to his immediate supervisor, Batie; in March 2012, Batie reported the harassment to his supervisor, Captain Pillington; and in August 2012, Albakri reported the harassment to Lieutenant McMullen. (Doc. 20-1 at 30, 114–15; Doc. 24-4 at 17.) Despite these earlier reports, Defendant only began investigating the harassment after Albakri's August 2012 report to Lieutenant McMullen.

Clearly, the above suggests that Defendant did not exercise reasonable care when investigating Albakri's—or Batie's—claims of discrimination. Thus, this element remains at issue. Therefore, there remain genuine issues of material fact regarding Albakri's hostile work environment claims, and Defendant's Motion (Doc. 20) will be denied as to Counts I and III.

**IV.   Retaliation Claims**

In Counts II and IV, Albakri claims that Defendant retaliated against him in response to his discrimination claim, violating 42 U.S.C. § 1981 and Title VII respectively.[6] Retaliation claims

---

[6] *See CBOCS W., Inc. v. Humphries*, 553 U.S. 442, 456 (2008) (holding that 42 U.S.C. § 1981 encompasses retaliation claims). Additionally, the "same substantive analysis applies to claims of retaliation brought under Title VIII and § 1981." *Stinson v. Pub. Serv. Tel. Co.*, 486 Fed.

based on circumstantial evidence are analyzed under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Bryant v. Jones*, 575 F.3d 1281, 1307 (11th Cir. 1998). Under this framework, a plaintiff must first establish a prima facie case of retaliation by showing: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal link between the protected activity and the adverse action. *Id.* at 1307–08. After a plaintiff establishes a prima facie case, the burden shifts to the defendant to provide a legitimate, non-discriminatory reason for the adverse employment action. *Id.* at 1308. The plaintiff must then show that the defendant's proffered reason was pretext for retaliation. *Id.*

As far as causation, "Title VII retaliation claims require proof that the [employer's] desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517, 2528 (2013). A plaintiff may satisfy his burden of proving causation by demonstrating a "close temporal proximity between the statutorily protected activity and the adverse employment action." *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007). "But mere temporal proximity, without more, must be 'very close.'" *Id.*

When measuring pretext, the question is "whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory reasons to permit a reasonable factfinder to conclude that the employee's proffered legitimate reasons were not what actually motivated its conduct." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1538 (11th Cir. 1997). If the proffered reason is one that a reasonable employer would act on, "an employee must meet that reason head on and rebut it, and the employee cannot succeed by simply quarreling with the wisdom of that reason." *Chapman v. AI Transp.*, 229 F.3d 1012, 1030 (11th Cir. 2000) (*en banc*).

---

App'x 8, 9 n.2 (11th Cir. 2012) (citing *Goldsmith v. Bagby Elevator Co.*, 513 F.3d 1261, 1277 (11th Cir. 2008)).

Here, Albakri made his formal complaint of discrimination on August 24, 2012—which both parties agree was a protected activity—and claims that that the manner in which he was first arrested and his eventual termination were retaliation in response to said complaint.

### A.   Was Albakri's First Arrest Retaliation?

On October 26, 2012, two months after his formal complaint, Albakri was arrested for insurance fraud. (Doc. 20-1 at 25.) The record shows that Defendant has discretion as to how, when, and where it makes arrests. (Doc. 20-17 at 16.) Using its discretion, Defendant sometimes makes certain accommodations for fellow officers who are subject to arrest. In particular, Defendant will sometimes give officers notice of the charges and an opportunity to surrender themselves for arrest. (Doc. 20-17 at 17.)

On the day of his first arrest, Albakri was at home when he noticed Defendant's deputies in tactical clothing surrounding his home. (Doc. 20-1 at 25.) After hearing a knock on his front door, he looked through the door's peephole, recognized officers from Defendant's Internal Affairs Division, and concluded that the officers were at his home because of his insurance fraud charges. (*Id.*) After opening the door, the officers notified Albakri that he was under arrest. Because he was wearing pajamas and slippers at the time, he asked permission to change his clothes before he was handcuffed and taken in, but was denied. (*Id.*)

Albakri argues that the humiliating nature of his arrest shows that it was materially adverse, and that Defendant's decision not to accommodate him by giving him a chance to surrender combined with the temporal proximity to his report suggests the decision not to accommodate him was retaliatory. As further support, Albakri points to the nonviolent nature of the crime that he was charged, the lack of evidence that Albakri was a flight risk, and the fact that

the second time Defendant arrested Albakri it accommodated him, giving two-day's notice and the opportunity to surrender to arrest.

Assuming *arguendo* that the manner in which Albakri was arrested was materially adverse, Albakri's attempt to show a causal connection between the arrest and his report fails. The time between the arrest and Albakri's protected activity were roughly two months apart, and, thus, close in temporal proximity. But, besides temporal proximity, Albakri merely lists some factors that Defendant *sometimes considers* when making an arrest—which is not equivalent to a suggestion that Defendant always accommodates an officer when these factors are present. The fact that Albakri was not a flight risk and charged with a nonviolent crime does not show that but-for Albakri's report of discrimination, Defendant would have decided to accommodate him. Additionally, nothing in the record shows that the arresting officers had any reason to retaliate against Albakri, much less any evidence that the officers were even aware of Albakri's report of discrimination. Therefore, Albakri has failed to demonstrate a causal connection between his report of discrimination and the nature of his arrest.

Even if the above were enough to show that Albakri's report and manner of arrest were causally connected, he does nothing to rebut the fact that Defendant had a legitimate non-retaliatory reason for making the arrest in the first place—the discretion as to where, when, and how to make an arrest and a warrant issued by the State of Florida. Therefore, no reasonable jury could find that the manner in which Albakri was arrested was retaliation under Title VII or § 1981.

### B.     Was Albakri's Termination Retaliation?

Certainly, Albakri's termination was an adverse employment action,[7] but, as stated above, Albakri must also show that it was causally connected to his report of discrimination. Albakri relies on temporal proximity alone to show that the events were causally connected. Specifically, Albakri argues that Defendant "began the process of discharging him on October 26, 2012," the day of his first arrest and roughly two months after he filed his formal report of discrimination.

It is true that Defendant's administrative investigation was close in time to Albakri's report of discrimination. But Albakri was not discharged—the complained-of materially adverse action—until a year and a half after his report. "[W]hile the burden of causation may be met by showing close temporal proximity between a plaintiff's protected activity and an adverse employment action, temporal proximity, alone, must be 'very close.'" *King v. Sec'y, U.S. Dep't of the Army*, 652 Fed. App'x 845, 847 (11th Cir. 2016) (quoting *Thomas v. Cooper Lighting, Inc.*, 506 F.3d 1361, 1364 (11th Cir. 2007)). Clearly, events that occur one-and-a-half years apart are not "very close" in temporal proximity. *Cooper Lighting, Inc.*, 506 F.3d at 1364 (finding that a three to four month disparity between the protected activity and the adverse employment action was not close enough to show causation). Lacking any other evidence of a causal connection, Albakri has failed to establish a prima facie claim of retaliation.

Even if Albakri had established a prima facie claim, he admits that Defendant has proffered a legitimate, non-retaliatory reason for his termination, and he has not shown that "the reason provided by the employer is a pretext for prohibited retaliatory conduct." *Bagby Elevator Co.*, 513 F.3d at 1277 (11th Cir. 2008). The reason proffered by Defendant was that it found that Albakri had likely committed a crime—insurance fraud—and that such conduct violated

---

[7] *Hurlbert v. St. Mary's Health Care Sys, Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006).

Defendant's requirement that its employees comply with Florida law. Albakri points to no evidence casting doubt on Defendant's reason to terminate him, or that retaliation was the real reason. Instead, Defendant relies on the "discriminatory and retaliatory animus" evidenced by the harassing conduct that lead to Albakri's complaint in the first place. Such an argument does not meet Defendant's legitimate reason for termination head on or rebut it, and it is, therefore, insufficient to show pretext. *AI Transp.*, 229 F.3d at 1030.

## V.    Discriminatory Discharge

In addition to retaliation, in Counts II and IV Albakri claims his discharge was based on discrimination. A plaintiff discharged for misconduct establishes a prima facie claim of discriminatory discharge if he shows that he was (1) a member of a protected class; (2) who suffered an adverse employment action; (3) was treated less favorably than similarly situated employees outside his protected class; and (4) was qualified for the job. *Williams v. Motorola, Inc.*, 303 F.3d 1284, 1293 (11th Cir. 2002) (citing *Nix v. WLCY Radio/Rahall Comm'ns*, 738 F.2d 1181, 1184 (11th Cir. 1984)).

Defendant admits that Albakri is a member of a protected class and that his discharge was an adverse employment action, but argues that Albakri has shown no evidence that similarly situated employees were treated more favorably. In response, Albakri provides five employees who he claims committed comparable or more serious infractions, were neither Arab nor Muslim, and were not discharged. But of those five, only one, Michelle Hutchinson, was found to have violated the same provision of Defendant's policies, "Conformance to Laws." And that employee was initially disciplined by termination, but said discipline was reversed in the same administrative appeals process made available to Albakri. (Doc. 20-17 at 107.)

Further, the record shows that twenty-six of Defendant's employees, who were neither Arabic nor Muslim, were disciplined for violating the same "Conformance to Laws" policy from January 1, 2012, to March 31, 2014. (Doc 20-24.) Of those, nine resigned or medically separated before their administrative investigations were completed,[8] and twelve were terminated.[9] Out of only five employees remaining who received lesser discipline than termination, three were sustained due to criminal investigations for driving under the influence,[10] one was sustained for associating with individuals known to be criminals,[11] and the final one was Michelle Hutchinson, discussed above. In short, none of the employees who received lesser discipline than termination—such as suspension or probation—committed misconduct comparable to that committed by Albakri.

Indeed, the most direct comparator to Albakri is Arthur Williams. Williams was terminated after falsifying timesheets and accepting payment in violation of state law—a crime that is strikingly similar to Albakri's alleged submission of a falsified receipt to his insurance carrier. (*Id.* at 61.) Therefore, because Albakri has failed to show that other similarly situated employees were treated more favorably, he has failed to state a claim for discriminatory discharge.

## VI.   Conclusion

In summary, a genuine issue of material fact remains for Albakri's hostile work environment claims in Counts I and III. However, Albakri has failed to establish any other claim

---

[8] *Id.* at 2, 16, 18, 19, 38, 41, 53, 61, 70. One of these seven received a notice of intent to terminate and resigned before the administrative appeals process completed. *Id.* at 18.

[9] *Id.* at 12, 27, 30, 31, 34, 38, 42, 47, 55, 59, 61, 69.

[10] *Id.* at 51, 56, 59.

[11] Doc. 24-4 at 65.

and, specifically, has failed to show that the legitimate, non-discriminatory reasons proffered by Defendant were pre-textual. It is therefore,

**ORDERED** that Defendant's Motion for Summary Judgment (Doc. 20) is **GRANTED** as to Counts II and IV. The Motion is otherwise **DENIED**.

**DONE** and **ORDERED** in Chambers, Orlando, Florida on March 31, 2017.

GREGORY A. PRESNELL
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Party